**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAVID HUX,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 11 - 1306** |
| | ) | |
| **v.** | ) | **Chief Judge Gary L. Lancaster** |
| | ) | **Chief Magistrate Judge Lisa Pupo Lenihan** |
| **MICHAEL J. ASTRUE,** | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

### I.    Introduction

Plaintiff David Hux ("Hux") brings this action pursuant to 42 U.S.C. § 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income ("SSI") benefits under Title XVI of the Social Security Act ("Act") [42 U.S.C. §§ 1381-1383f].  The matter is presently before the Court on cross-motions for summary judgment filed by the parties pursuant to Federal Rule of Civil Procedure 56.  ECF Nos. 10 & 12.  For the reasons that follow, it is respectfully recommended that Hux's motion for summary judgment (*ECF No. 10*) be denied, that the Commissioner's motion for summary judgment (*ECF No. 12*) be granted, and that the Commissioner's decision be affirmed.

### II.    Procedural History

Hux protectively applied for SSI benefits on July 14, 2009, alleging that he had become "disabled" on January 1, 1972.  R. at 86, 98.  Pennsylvania's Bureau of Disability Determination denied the application on November 2, 2009.  R. at 49-53.  Hux responded on December 8, 2009,

by filing a timely request for an administrative hearing.  R. at 54-55.  On April 29, 2011, a hearing was held in Pittsburgh, Pennsylvania, before Administrative Law Judge ("ALJ") James Bukes.  R. at 29.  Hux, who was represented by counsel, appeared and testified at the hearing.  R. at 32-43.  Mary Beth Kopar ("Kopar"), an impartial vocational expert, also testified at the hearing.  R. at 43-45.  In a decision dated May 18, 2011, the ALJ determined that Hux was not "disabled" within the meaning of the Act.  R. at 8-25.

On June 15, 2011, Hux sought administrative review of the ALJ's decision by filing a request for review with the Appeals Council.  R. at 6.  The Appeals Council denied the request for review on September 15, 2011, thereby making the ALJ's decision the final decision of the Commissioner in this case.  R. at 1.  Hux commenced this action on October 12, 2011, seeking judicial review of the Commissioner's decision.  ECF Nos. 1 & 3.  Hux and the Commissioner filed motions for summary judgment on February 20, 2012, and March 20, 2012, respectively.  ECF Nos. 10 & 12.  These motions are the subject of this report and recommendation, which is being filed pursuant to 28 U.S.C. § 636(b)(1)(C).

## III.    <u>Standard of Review</u>

This Court's review is plenary with respect to all questions of law.  *Schaudeck v. Commissioner of Social Security Administration*, 181 F.3d 429, 431 (3d Cir. 1999).  With respect to factual issues, judicial review is limited to determining whether the Commissioner's decision is "supported by substantial evidence."  42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994).  The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record.  *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-1191 (3d Cir. 1986).  Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be

conclusive." 42 U.S.C. § 405(g).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)(internal quotation marks omitted).  As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently."  *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  "Overall, the substantial evidence standard is a deferential standard of review."  *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period."  *Stunkard v. Secretary of Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions.  He or she must make specific findings of fact.  *Stewart v. Secretary of Health, Education & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983).  The administrative law judge must consider all medical evidence contained in the record and provide adequate

explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively-delegated rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court recently summarized this process by stating as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003)(footnotes omitted). Factual findings pertaining to all steps of the sequential evaluation process are subject to judicial review under the "substantial evidence" standard. *McCrea v. Commissioner of Social Security*, 370 F.3d 357, 360-361 (3d Cir. 2004).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 67

S.Ct. 1575, 91 L.Ed. 1995 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196. The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision. *Cefalu v. Barnhart*, 387 F.Supp.2d 486, 491 (W.D.Pa. 2005).

## IV.    The ALJ's Decision

In his decision, the ALJ determined that Hux had not engaged in substantial gainful activity subsequent to the date of his application.[1] R. at 13. Hux was found to be suffering from diabetes (with mild neuropathy), major depressive disorder, obsessive-compulsive disorder ("OCD"), anxiety, hypertension, hyperlipidemia, and a history of drug and alcohol abuse. R. at 13. His diabetes, major depressive disorder, OCD and anxiety were deemed to be "severe" under the Commissioner's regulations, while his remaining impairments were deemed to be "non-severe." R. at 13; 20 C.F.R. §§ 416.920(a)(4)(ii), 416.920(c). The ALJ concluded that Hux's impairments did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. at 13-17.

---

[1] Hux filed a previous application for SSI benefits on February 28, 2005, alleging that he had become "disabled" on May 1, 1984. R. at 11. The application was ultimately denied in a decision rendered on July 20, 2007. R. at 11. The ALJ found that denial to be "final and binding," thereby limiting his consideration of Hux's application to the period of time postdating July 20, 2007. R. at 11. In any event, a claimant cannot receive SSI benefits retroactively. 20 C.F.R. § 416.335. Therefore, the period of time elapsing between Hux's alleged onset date and the date of his application is of no dispositive significance.

In accordance with 20 C.F.R. § 416.945, the ALJ assessed Hux's "residual functional capacity"[2] as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that he is limited to simple instructions. In addition, he would need to avoid decision-making, avoid crowds or groups of people; avoid intensive supervision [sic] avoid close interaction with co-workers; avoid changes in the work setting; and avoid assembly line pace work.

R. at 17. Hux had no "past relevant work."[3] R. at 24. He was born on June 1, 1960, making him forty-nine years old on the date of his application. R. at 32. At that point, Hux was classified as a "younger person" under the Commissioner's regulations.[4] 20 C.F.R. § 416.963(c). He became a "person closely approaching advanced age" on June 1, 2010, when he reached the age of fifty. 20 C.F.R. § 416.963(d). He had a "limited education"[5] and an ability to communicate in English. R. at 33, 102, 109; 20 C.F.R. § 416.964(b)(3), (5). Given the applicable residual functional capacity and vocational assessments, the ALJ concluded that Hux could work as a sorter, marker or cleaner. R. at 25. Kopar's testimony established that these jobs existed in the national economy for purposes of 42 U.S.C. § 1382c(a)(3)(B).[6] R. at 44.

---

[2] The term "residual functional capacity" is defined as "that which an individual is still able to do despite the limitations caused by his or her impairments." *Hartranft v. Apfel*, 181 F.3d 358, 359, n. 1 (3d Cir. 1999)(parentheses omitted), citing 20 C.F.R. § 404.1545(a). The same residual functional capacity assessment is used at the fourth and fifth steps of the sequential evaluation process. 20 C.F.R. §§ 404.1545(a)(5)(i)-(ii), 416.945(a)(5)(i)-(ii).

[3] "Past relevant work" is defined as "substantial gainful activity" performed by a claimant within the last fifteen years that lasted long enough for him or her to learn how to do it. 20 C.F.R. §§ 404.1560(b)(1), 416.960(b)(1). The Commissioner has promulgated comprehensive regulations governing the determination as to whether a claimant's work activity constitutes "substantial gainful activity." 20 C.F.R. §§ 404.1571-404.1576, 416.971-416.976.

[4] The regulations recognize that "younger persons" between the ages of forty-five and forty-nine are more limited in their ability to adjust to other work than are persons who have not yet attained the age of forty-five. 20 C.F.R. §§ 404.1563(c), 416.963(c).

[5] Hux testified that he had dropped out of school shortly after completing the seventh grade. R. at 33. The documentary record indicates that he completed the seventh grade in 1972. R. at 109.

[6] At the fifth step of the sequential evaluation process, "the Commissioner bears the burden of proving that, considering the claimant's residual functional capacity, age, education, and past work experience, [he or] she can perform work that exists in significant numbers in the regional or national economy." *Boone v. Barnhart*, 353 F.3d 203, 205 (3d Cir. 2003). This burden is commonly satisfied by means of vocational expert testimony. *Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005).

## V.    Discussion

At the hearing, Hux testified that his impairments did not limit his standing and walking abilities.  R. at 40.  The ALJ determined that Hux was physically capable of engaging in only "light"[7] work activities.  R. at 17.  This limitation was included within the ALJ's residual functional capacity assessment even though no treating or consulting physician had attributed functional limitations to Hux's diabetic condition.  R. at 20.  Hux concedes that, during the relevant period of time, he had no physical limitations beyond those inherent in the definition of "light" work.  ECF No. 11 at 3, n. 1.  The disputed factual issues in this case relate solely to his mental limitations.

Between January 2007 and the date of the ALJ's decision, Hux consistently sought treatment for his mental impairments at Mercy Behavioral Health ("Mercy").  R. at 143-302, 328-403.  His primary caregivers at Mercy were Dr. Laura Childress-Hazen, a psychiatrist, and Susan Besselman ("Bessleman"), a registered nurse.  R. at 35-36, 38.  Dr. Hazen provided Hux with prescriptions for Neurontin, Abilify and Prozac to control his depression.[8]  R. at 35-36, 142, 410.

Dr. Steven Pacella performed a consultative psychological evaluation of Hux on October 8, 2009.  R. at 303-309.  After completing the evaluation, Dr. Pacella reported that Hux had "marked" limitations in his abilities to interact appropriately with co-workers, respond appropriately to work pressures in a usual work setting, and respond appropriately to changes in a routine work setting.  R. at 307.  Dr. Pacella also indicated that Hux had "moderate" limitations

---

[7] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities."  20 C.F.R. §§ 404.1567(b), 416.967(b).

[8] Hux's primary care physician, Dr. Teri Willochell, provided him with other prescriptions to control his diabetes, cholesterol and blood pressure.  R. at 36, 142.

in his abilities to understand and remember detailed instructions, carry out detailed instructions, make judgments concerning simple work-related decisions, interact appropriately with supervisors, and interact appropriately with members of the general public. R. at 307. In the portion of his examination report discussing Hux's functional abilities and limitations, Dr. Pacella described Hux as "a marginal candidate to work within a schedule, attend to a task or sustain a consistent, competitive routine." R. at 306.

Dr. Grant W. Croyle, a non-examining psychological consultant, opined on October 26, 2009, that Hux's impairments would not prevent him from "meeting the basic mental demands of competitive work on a sustained basis." R. at 313. Dr. Croyle gave his opinion after reviewing the record of Hux's treatment at Mercy and the report of Dr. Pacella's evaluation. R. at 326. Describing the results of Dr. Pacella's evaluation as "only a snapshot" of Hux's level of functioning and "an overestimate of the severity of his limitations," Dr. Croyle declined to afford "great weight" to Dr. Pacella's assessment. R. at 312. The ALJ accorded "great weight" to Dr. Croyle's opinion, finding it to be "consistent with the record as a whole." R. at 14. Dr. Pacella's finding of "marked" limitations was deemed to be inconsistent with Hux's treatment records. R. at 15.

Dr. Croyle indicated that Hux had "moderate" limitations in his activities of daily living, maintenance of social functioning, and maintenance of concentration, persistence or pace. R. at 324. Hux argues that the ALJ erred in failing to include these "limitations" in his residual functional capacity assessment and corresponding hypothetical question to Kopar. ECF No. 11 at 6-9. This argument is lacking in merit.

Under the Commissioner's regulations, a claimant's mental impairments must be considered with reference to "four broad functional areas" at the *second* and *third* steps of the

sequential evaluation process. 20 C.F.R. § 416.920a(c)(3). The "moderate" limitations identified by Dr. Croyle related to three of those "four broad functional areas." R. at 324. Since the ALJ determined that Hux was "moderately" limited in those areas, his mental impairments were deemed to be "severe" at the second step of the process. R. at 13-17; 20 C.F.R. § 416.920a(d)(1). Because Hux was not found to have "marked" limitations in any two of the three relevant areas, his impairments were not deemed to be *per se* disabling at the third step. R. at 13-17; 20 C.F.R. § 416.920a(d)(2); 20 C.F.R. Part 404, Subpart P, Appendix 1, Listings 12.04, 12.06 & 12.09. No extended episodes of decompensation were uncovered during Dr. Croyle's review of Hux's treatment records. R. at 324. Consequently, it became necessary for the ALJ to assess Hux's residual functional capacity. 20 C.F.R. § 416.920a(d)(3). Had Hux been "markedly" limited in two of the first three "functional areas," his impairments would have rendered him *per se* disabled. 20 C.F.R. Part 404, Subpart P, Appendix 1, Listings 12.04, 12.06 & 12.09. Alternatively, he could have obtained benefits by establishing the existence of a "marked" limitation in one of those areas and combining it with evidence of "[r]epeated episodes of decompensation, each of extended duration." *Id.* A finding of *per se* disability, of course, would have made it unnecessary for the ALJ to assess Hux's residual functional capacity. A claimant's residual functional capacity is relevant only at the *fourth* and *fifth* steps of the analysis. 20 C.F.R. § 416.945(a)(5)(i)-(ii).

The "moderate" limitations in Hux's activities of daily living, maintenance of social functioning, and maintenance of concentration, persistence or pace were only relevant for the purpose of determining *whether* the ALJ needed to make a residual functional capacity finding in the first place. 20 C.F.R. § 416.920a(d)(1)-(3). They had no direct bearing on the *content* of that finding. The assessment of a claimant's residual functional capacity must account for all

"physical and mental limitations" that have an impact on what he or she "can do in a work setting." 20 C.F.R. § 416.945(a)(1). The specificity required to make such an assessment is not compatible with an analysis tailored to "broad functional areas." 20 C.F.R. § 416.920a(c)(3). The ALJ correctly observed that "a more detailed assessment" of Hux's abilities and limitations was necessary before the fourth and fifth steps of the sequential evaluation process could be reached. R. at 17. This analysis conformed to the Commissioner's regulations. Hux's argument to the contrary is unavailing. ECF No. 11 at 6-9.

A vocational expert's testimony cannot be relied upon to establish the existence of jobs in the national economy consistent with a claimant's residual functional capacity unless the question eliciting that testimony properly incorporates all of the claimant's functional limitations. *Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002). Where a credibly established limitation is omitted from an administrative law judge's hypothetical question to a vocational expert, there is a danger that the vocational expert will identify jobs requiring the performance of tasks that would be precluded by the omitted limitation. *Ramirez v. Barnhart*, 372 F.3d 546, 552-555 (3d Cir. 2004). In this case, however, Kopar's testimony accounted for every limitation found by the ALJ. The ALJ's first hypothetical question to Kopar included all limitations contained in the residual functional capacity assessment other than the restriction precluding the performance of "assembly line pace work." R. at 17, 44. Kopar testified that the individual described by the ALJ could work as a sorter, marker or cleaner. R. at 44. In response to a follow-up question posed by the ALJ, Kopar stated that a limitation precluding the performance of "assembly line pace work" would not change her testimony. R. at 44. Since the ALJ's colloquy with Kopar made reference to all limitations later identified in the residual functional capacity finding, Kopar's testimony satisfied the Commissioner's burden of establishing that jobs existed in the

national economy that could be performed by an individual with those limitations. *Boone v. Barnhart*, 353 F.3d 203, 205-209 (3d Cir. 2003). The remaining arguments raised by Hux must be viewed as direct challenges to the ALJ's underlying residual functional capacity assessment. *Rutherford v. Barnhart*, 399 F.3d 546, 554, n. 8 (3d Cir. 2005).

Hux maintains that the ALJ failed to give "appropriate weight" to Dr. Pacella's consultative opinion. ECF No. 11 at 10-16. In determining that Hux could engage in substantial gainful activity, the ALJ accorded "great weight" to Dr. Croyle's consultative assessment. R. at 14. The opinion of an examining source is ordinarily entitled to more weight than the opinion of a non-examining source. 20 C.F.R. § 416.927(c)(1); *McPherson v. Astrue*, 605 F.Supp.2d 744, 772 (S.D.W.Va. 2008). Nevertheless, an assessment provided by a non-examining consultant can sometimes be sufficiently probative to outweigh an opinion of disability supplied by a treating or examining source. *Brown v. Astrue*, 649 F.3d 193, 196-197 (3d Cir. 2011); *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991).

Although the ALJ observed that some of the "marked" limitations identified by Dr. Pacella were inconsistent with Hux's treatment records, he accounted for those limitations in any event.[9] R. at 15. Dr. Pacella reported that Hux had "marked" limitations in his abilities to interact appropriately with co-workers, respond appropriately to work pressures in a usual work setting, and respond appropriately to changes in a routine work setting. R. at 307. In his residual functional capacity finding, the ALJ recognized that Hux needed to avoid "close interaction with co-workers" and "changes in the work setting." R. at 17. The ALJ further noted that the limitations contained in the residual functional capacity assessment would "reasonably" address

---

[9] In his decision, the ALJ attributed some of the "marked" limitations identified by Dr. Pacella to Hux's subjective complaints. R. at 16. Hux contends that it was improper for the ALJ to "reject" Dr. Pacella's opinion on that basis. ECF No. 11 at 20-21. Since the limitations found by Dr. Pacella were specifically accounted for, his opinion was not truly "rejected." R. at 17, 44, 305-307.

Hux's "stress intolerance." R. at 16. The restriction permitting Hux to avoid "assembly line pace work" appears to have been added precisely because he was not able to work in a stressful environment. R. at 16-17, 44. Given the nature of the accommodations provided by the ALJ, an individual working within the parameters of his residual functional capacity assessment would not be exposed to a *usual* work setting.

Dr. Pacella indicated that Hux had "moderate" limitations in his abilities to understand and remember detailed instructions, carry out detailed instructions, make judgments concerning simple work-related decisions, interact appropriately with members of the general public, and interact appropriately with supervisors. R. at 307. The ALJ accounted for all of these limitations by restricting Hux to jobs involving only "simple instructions" and permitting him to avoid "decision-making," "crowds or groups of people," and "intensive supervision." R. at 17. By eliminating *all* "decision-making," the ALJ went beyond the restrictions found by Dr. Pacella. Despite the existence of a "moderate" limitation in Hux's ability to make judgments concerning simple work-related decisions, Dr. Pacella specifically stated that Hux could "make simple decisions." R. at 305.

As discussed earlier, Dr. Pacella described Hux as "a *marginal* candidate to work within a schedule, attend to a task or sustain a consistent, competitive routine." R. at 306 (emphasis added). This characterization of Hux did not necessarily equate to an opinion of disability. The extent to which an impairment may prevent a claimant from attending work on a regular basis is certainly relevant to the inquiry. *Wright v. Sullivan*, 900 F.2d 675, 682 (3d Cir. 1990). Kopar testified that no jobs existed in the national economy for an individual who consistently needed to miss three days of work per month.[10] R. at 44-45. In response to a question posed by Hux's

---

[10] The inquiry required under the Social Security Act does not account for any "reasonable accommodations" mandated by Title I of the Americans with Disabilities Act of 1990 [42 U.S.C. §§ 12111-12117]. *Cleveland v.*

counsel, Kopar stated that an employee who consistently failed to attend to his or her duties for more than fifteen percent of a workday would be terminated. R. at 45. The dispositive question is whether "substantial evidence" supports the ALJ's conclusion that Hux *could* maintain a regular work schedule and stay on task while working. By referring to Hux as a "marginal candidate" for such activity, Dr. Pacella did not provide a clear answer to that question.[11] R. at 306.

As a patient, Hux was in the best position to obtain statements from his treating healthcare providers detailing his work-related abilities and limitations. *Bowen v. Yuckert*, 482 U.S. 137, 146, n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). The Commissioner correctly points out that the lack of information from Hux's treating sources concerning his functional limitations was a proper factor for consideration in determining the degree to which his impairments limited his ability to work. ECF No. 13 at 11; *Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983). Given the ambivalent nature of Dr. Pacella's opinion and the absence of support for Hux's alleged disabling limitations from his treating sources, it was not unreasonable for the ALJ to adopt Dr. Croyle's view that Hux "retain[ed] the abilit[y] to manage the mental demands of many types of jobs not requiring complicated tasks." R. at 312.

The ALJ attributed some of the "marked" limitations found by Dr. Pacella to Hux's "subjective reports" rather than to "clinical findings." R. at 16. Hux strenuously maintains that the ALJ erred in making this determination. ECF No. 11 at 20-21. The findings of a consultative examination cannot be disregarded solely on the ground that they are based on a

---

*Policy Management Systems Corp.*, 526 U.S. 795, 803, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999); *Poulos v. Commissioner of Social Security*, 474 F.3d 88, 95 (3d Cir. 2007).

[11] Although Hux purports to raise a number of distinct arguments, most of them relate to the weight that the ALJ accorded to Dr. Pacella's assessment. ECF No. 11 at 6-25. Since the ALJ accounted for every *specific* limitation found by Dr. Pacella, many of the ALJ's observations questioning the validity of those limitations were inconsequential. R. at 17, 44, 305-307.

claimant's subjective complaints unless the record contains evidence suggesting that the examiner actually relied on such complaints to the detriment of objective clinical observations. *Ryan v. Commissioner of Social Security*, 528 F.3d 1194, 1199-1200 (9th Cir. 2008). In this case, however, Dr. Pacella specifically stated that his opinion was partially based on Hux's "subjective complaints," and that he had assumed the accuracy of the information provided by Hux. R. at 306. Dr. Croyle asserted that there were "inconsistencies" in Dr. Pacella's examination report. R. at 312. While the ALJ "partially accepted" Dr. Pacella's assessment, he found it to be less persuasive than the assessment supplied by Dr. Croyle. R. at 22.

Dr. Pacella reported that Hux had been "abstinent" from drug and alcohol abuse since 1985.[12] R. at 304. In a subsequent portion of his examination report, Dr. Pacella stated that the "current course" of Hux's "[a]lcohol and [c]ocaine [a]buse" was "unknown." R. at 305. The ALJ took notice of this "inconsistency" in his decision. R. at 22. Hux contends that the ALJ's "cryptic reference" to his "substance abuse issues" was improper, since there was no evidence suggesting that those "issues" had an impact on his ability to work. ECF No. 11 at 21. The ALJ's reference to substance abuse, however, did not relate to limitations affecting Hux's ability to work. Instead, it related solely to the reliability of Dr. Pacella's report in a more general sense. R. at 22. The fact that an examination report is "internally contradictory" may have some bearing on its overall reliability. *Jones*, 954 F.2d at 129. The ALJ's observation about this "inconsistency" in the examination report did not undermine his decision to "partially" reject Dr. Pacella's opinion. R. at 22.

The documentary record indicates that Hux was "fired" from his last job on September 15, 2001, because of his failure to complete job assignments and get along with co-workers. R. at 103. In his examination report, Dr. Pacella stated that Hux had "quit" his last full-time job in

---

[12] At the hearing, Hux testified that he had stopped abusing drugs and alcohol in the early 1980's. R. at 35.

2004. R. at 304. The ALJ observed that Dr. Pacella's statement was inconsistent with the record. R. at 22. Hux maintains that the inconsistency pertaining to his work history had no obvious relevance to the limiting effects of his impairments. ECF No. 11 at 22. While that may be true, the irrelevance of such a factor similarly counsels against setting aside the ALJ's decision. *Rutherford*, 399 F.3d at 553 (concluding that a remand was not required because it would not have affected the outcome of the case).

Hux testified that he typically spent "a lot of time in bed," and that his "mood swings and depression" would prevent him from fulfilling the duties of a full-time job. R. at 36-37. He stated that he had lost an earlier job as a cleaner in a doctor's office because of his inability "to be precise with the cleaning." R. at 34. Hux also described an instance in which he had lost a job in a deli after failing to properly complete the orders submitted by customers. R. at 42. John Robbins ("Robbins"), Hux's roommate, declared in a handwritten statement that Hux was "unable to get out of bed" on some days, but that he was alright on other days. R. at 141. Hux provided an affirmative answer when asked whether his depression would cause him to miss work on a frequent basis. R. at 38. The ALJ concluded that Hux's treatment records and daily activities were not reflective of an individual who needed to spend "a lot of time in bed." R. at 24. In this respect, Hux was not deemed to be "an entirely credible witness." R. at 24.

The records of Hux's treatment sessions at Mercy indicate that his depressive symptoms were consistently controlled with medication. R. at 177, 181, 185, 289, 292, 299, 363, 388, 396. Even when his depression was exacerbated by a holiday trip to Virginia, Hux reported that his medications had been effective. R. at 295. On October 18, 2010, Hux told Besselman that his depression had sometimes caused him to want to remain in bed. R. at 367. Nevertheless, he also stated that he typically experienced more good days than bad days. R. at 399. In order to

establish his or her entitlement to benefits under the Act, a claimant must demonstrate that both his or her medically determinable impairment (or combination of impairments) and his or her inability to work have lasted (or are expected to last) for the statutory twelve-month period. *Barnhart v. Walton*, 535 U.S. 212, 214-222, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002). Consequently, the short-term exacerbations of Hux's symptoms referenced in his treatment notes were not of sufficient duration to establish his entitlement to benefits. Since his symptoms were generally controlled with medication, the ALJ was free to conclude that they were not disabling.[13] *Jackson v. Heckler*, 580 F.Supp. 1077, 1079 (E.D.Pa. 1984)(remarking that an impairment "is not disabling under the Social Security Act" when it "can be remedied by medication or treatment").

Treatment records provided by Dr. Teri Willochell, Hux's primary care physician, suggest that Hux successfully began an exercise program after learning that he had diabetes. R. at 410, 416, 418. His diabetes was diagnosed during the spring of 2009. R. at 135. On June 4, 2009, Hux told Dr. Willochell that "increased physical activity" had caused him to lose eleven pounds. R. at 418. Five months later, Dr. Willochell reported that Hux had lost twenty-one pounds and was feeling "great." R. at 416. Dr. Bala Allam, a treating physician, noted on June 10, 2010, that Hux was exercising and losing weight. R. at 410. Hux testified that he regularly cooked his own meals. R. at 40. The ALJ concluded that Hux's daily activities were "not consistent with his claims of spending most of his time in bed." R. at 24.

Since Hux presented evidence of impairments that could reasonably be expected to cause the symptoms alleged in his testimony, his subjective complaints warranted "serious

---

[13] The ALJ stated that Hux had not reported his symptoms to his treating healthcare providers on a consistent basis, and that his "complaints of always being depressed" had begun shortly after his procurement of counsel. R. at 23. Hux takes issue with these statements. ECF No. 11 at 17-18, 23-24. Regardless of whether Hux's symptoms were consistently reported in a more general sense, all that matters is whether they were consistently *disabling*. *Barnhart v. Walton*, 535 U.S. 212, 214-222, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002).

consideration." *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993). Nonetheless, the ALJ was not required to credit Hux's testimony in every respect. *Chandler v. Commissioner of Social Security*, 667 F.3d 356, 363 (3d Cir. 2011). Aside from a single treatment note, the record does not support Hux's assertion that he frequently needed to remain in bed because of depression. R. at 367. His treating healthcare providers consistently reported that he was regularly sleeping for roughly eight hours per night. R. at 336, 350, 363, 367, 375. Hux testified that, on a typical morning, he would "get up" at 9:00 and turn on his television. R. at 40. He routinely claimed that his depressive symptoms were controlled with medication.[14] R. at 177, 181, 185, 289, 292, 299, 363, 388, 396. In light of this evidence, the ALJ acted within his discretion in determining that Hux's subjective complaints of disabling depressive symptoms were not "entirely credible." R. at 24.

In determining Hux's residual functional capacity, the ALJ placed some reliance on his "personal observations" of Hux at the hearing. R. at 22. In *Van Horn v. Schweiker*, 717 F.2d 871, 874 (3d Cir. 1983), the United States Court of Appeals for the Third Circuit referred to the rendering of decisions based on the "non-expert observations" of lay adjudicators as "the roundly condemned 'sit and squirm' method of deciding disability cases." Seizing on this language, Hux maintains that the ALJ acted improperly by relying on his own observations. ECF No. 11 at 17. Under the present circumstances, however, that argument is manifestly unpersuasive. The demeanor of a witness has always been regarded as a legitimate factor in determining the credibility of his or her testimony. *Anderson v. Bessemer City*, 470 U.S. 564, 575, 105 S.Ct.

---

[14] The fact that an individual's medical condition is controlled with medication cannot always be equated with a determination that he or she can work. *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355-356 (3d Cir. 2008). Nevertheless, Hux's contention that he frequently needed to remain in bed for long periods of time was fundamentally inconsistent with the notes supplied by his treating healthcare providers. An individual who is too depressed to get out of bed would not ordinarily be expected to begin an exercise program and lose a significant amount of weight. R. at 410, 416, 418.

1504, 84 L.Ed.2d 518 (1985)(stating that "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said").  The language used by the Court of Appeals in *Van Horn* does not remove a claimant's demeanor from consideration as a factor relevant to his or her credibility.  The problem in *Van Horn* was that an administrative law judge had rejected disabling limitations identified by a claimant's treating physician and a consultative examiner *solely* because the claimant's "emotional" difficulties had not manifested themselves during an administrative hearing.  *Van Horn*, 717 F.2d at 873.  In this case, Hux's treating healthcare providers never reported that his impairments resulted in work-related limitations.  The limitations found by Dr. Pacella were included within the ALJ's residual functional capacity assessment.  R. at 17, 305-307.  Dr. Croyle opined that Hux's mental impairments were not disabling.  R. at 312-313.  For these reasons, Hux's reliance on *Van Horn* is misplaced.

During the period of time covered by the treatment notes contained in the record, Hux's treating healthcare providers rated his Global Assessment of Functioning ("GAF") at 55 on fourteen occasions.  R. at 147, 150, 158, 162, 166, 175, 179, 183, 266, 275, 279, 348, 367, 375.  On seven other occasions, Hux was given a GAF rating of 50.  R. at 260, 266, 329, 334, 340, 354, 361.  The ALJ relied on the GAF scores of 55 to support his conclusion that Hux had only "moderate" limitations.  R. at 15.  The GAF scores of 50 were not specifically addressed in the ALJ's decision.  Hux contends that this omission by the ALJ requires a remand for further proceedings.  ECF No. 11 at 18-19.

In determining a claimant's residual functional capacity, an administrative law judge must consider all relevant evidence and explain his or her reasons for rejecting or discounting evidence that is deemed to be lacking in credibility.  *Burnett v. Commissioner of Social Security*

*Administration*, 220 F.3d 112, 121 (3d Cir. 2000).  This rule, however, applies only to evidence

that is *pertinent* and *probative*.  *Johnson v. Commissioner of Social Security*, 529 F.3d 198, 203-

204 (3d Cir. 2008).  Although GAF scores may be "useful in tracking a patient's progress in

global terms," they do not necessarily correlate with work-related abilities and limitations.

*Chanbunmy v. Astrue*, 560 F.Supp.2d 371, 383 (E.D.Pa. 2008).  A GAF rating of 50 cannot be

equated with a determination that a claimant is disabled.  *Jones v. Astrue*, 494 F.Supp.2d 1284,

1288 (N.D.Ala. 2007).  Where an administrative law judge thoroughly discusses the medical

evidence pertaining to a claimant's functional limitations, his or her failure to mention low GAF

scores does not inevitably require a remand.  *Davis v. Astrue*, 830 F.Supp.2d 32, 45-48 (W.D.Pa.

2011).

Hux argues that the ALJ expressly recognized the relevance of the GAF scores by relying

on the higher scores in his decision.  ECF No. 11 at 18-19.  The ALJ relied on the higher scores

in determining that the "marked" limitations found by Dr. Pacella were "not consistent with the

record as a whole."  R. at 15.  That portion of the ALJ's decision concerned the issue of *per se*

disability at the third step of the sequential evaluation process.  R. at 15.  The ALJ referred to the

GAF ratings of 55 for the purpose of explaining why Hux was not "markedly" limited in the

"broad functional area" of activities of daily living.  R. at 15.  Hux does not argue that the ALJ's

conclusion at the third step was erroneous.  Instead, he attacks the ALJ's residual functional

capacity finding.  ECF No. 11 at 10-16.  In this respect, Hux's GAF scores are only marginally

relevant to the issues in this case.  Even if the higher scores were somehow used to evaluate the

more specific "marked" limitations described in Dr. Pacella's examination report, those

limitations were ultimately accounted for in any event.[15] R. at 17, 44, 305-307. Under these circumstances, the omission of the lower GAF scores from the ALJ's analysis provides no basis for setting aside his decision. *Davis*, 830 F.Supp.2d at 45-48.

Hux asserts that the ALJ wrongfully relied on his "sporadic daily activities" as a basis for denying him benefits. ECF No. 11 at 22. A claimant's ability to take care of his or her "personal needs" and perform "limited household chores" is not necessarily indicative of an accompanying ability to maintain a full-time job. *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988). Nonetheless, a claimant's "daily activities" may be considered as a factor in ascertaining the intensity and persistence of his or her symptoms. 20 C.F.R. § 416.929(c)(3)(i). Hux testified that he spent "a lot of time in bed." R. at 37. That was his primary reason for claiming that he could not work on a regular basis. R. at 36-37. Despite Hux's testimony concerning his inability to get out of bed, his treating physicians reported that he had begun an exercise program and lost a considerable amount of weight. R. at 410, 416, 418. An individual who is too depressed to get out of bed would not normally be expected to exercise on a regular basis. It was not unreasonable for the ALJ to conclude that Hux's activities of daily living were inconsistent with the degree of limitation alleged in his testimony. R. at 24.

## VI.    Conclusion

Although Hux assails the ALJ for "rejecting" the functional limitations found by Dr. Pacella, the record indicates that those limitations were actually incorporated within the ALJ's residual functional capacity assessment. R. at 17, 44, 305-307. By describing Hux as a "marginal candidate" to maintain the duties of a full-time job, Dr. Pacella did not specifically assert that Hux was incapable of working. R. at 306. Dr. Croyle clearly opined that Hux was not

---

[15] The ALJ apparently gave Hux the benefit of the doubt by accepting certain limitations that he did not deem to be credibly established. For instance, the ALJ concluded that Hux was physically limited to "light" work even though no limitations had been attributed to his physical impairments. R. at 19-20.

disabled. R. at 312-313. No treating sources suggested that Hux's mental impairments resulted in work-related limitations. The Commissioner's decision denying Hux's application for SSI benefits is "supported by substantial evidence" and should be affirmed. 42 U.S.C. § 405(g).

Accordingly, it is respectfully recommended that Hux's motion for summary judgment (*ECF No. 10*) be denied, that the Commissioner's motion for summary judgment (*ECF No. 12*) be granted, and that the Commissioner's decision be affirmed. In accordance with 28 U.S.C. § 636(b)(1), the parties have fourteen days to file written objections to this report and recommendation. A party's failure to file written objections will seriously impair his ability to challenge this Court's legal conclusions on appeal. *Brightwell v. Lehman*, 637 F.3d 187, 193, n. 7 (3d Cir. 2011).


August 27, 2012                                          s/Lisa Pupo Lenihan
Date                                                     LISA PUPO LENIHAN
                                                         Chief United States Magistrate Judge


cc:      All counsel of record